COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-08-333-CR

 

 

ROBERT SCOTT, JR.                                                            APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

            FROM THE 158TH
DISTRICT COURT OF DENTON COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

                                          I.  Introduction








In three issues, Appellant Robert Scott, Jr.
complains that:  (1) there was no
independent corroborating evidence to support accomplice testimony; (2) the
testimony of extraneous acts was admitted in violation of Scott=s
rights; and (3) hearsay statements of a confidential source were admitted in
violation of Crawford v. Washington.[2]  We affirm.

                              II.  Factual and Procedural History

This case involves a Areverse
buy@[3] set up
by the Denton County Sheriff=s Office
using a Drug Enforcement Administration (DEA) confidential informant.  Scott pleaded not guilty to attempted
possession of a controlled substance in an amount over 400 grams and of illegal
barter, expenditure, or investment,[4]
but the jury found him guilty of both crimes. 
At punishment, after Scott pleaded true to a prior felony conviction for
delivery of a controlled substance, he faced a possible sentence for each
conviction of confinement of fifteen years to life.  The jury imposed sixty years=
confinement for each conviction, and this appeal followed.

                                  III.  Corroborating Evidence

In his first issue, Scott complains that there
was no independent corroborating evidence to support the accomplice testimony.








A.  Standard of Review

Article 38.14 of the code of criminal procedure
provides that

[a] conviction cannot be had
upon the testimony of an accomplice unless corroborated by other evidence
tending to connect the defendant with the offense committed; and the
corroboration is not sufficient if it merely shows the commission of the
offense.

Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon 2005).








When evaluating the sufficiency of corroboration
evidence under the accomplice-witness rule, we Aeliminate
the accomplice testimony from consideration and then examine the remaining
portions of the record to see if there is any evidence that tends to connect
the accused with the crime.@  Malone v. State, 253 S.W.3d 253, 257
(Tex. Crim. App. 2008) (quoting Solomon v. State, 49 S.W.3d 356, 361
(Tex. Crim. App. 2001)).  To meet the
requirements of the rule, the corroborating evidence need not prove the
defendant=s guilt beyond a reasonable
doubt by itself.  Malone, 253
S.W.3d at 257; Trevino v. State, 991 S.W.2d 849, 851 (Tex. Crim. App.
1999); Gill v. State, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994).  Nor is it necessary for the corroborating
evidence to directly link the accused to the commission of the offense.  Cathey v. State, 992 S.W.2d 460, 462
(Tex. Crim. App. 1999), cert. denied, 528 U.S. 1082 (2000).  Rather, the evidence must simply link the
accused in some way to the commission of the crime and show that Arational
jurors could conclude that this evidence sufficiently tended to connect [the
accused] to the offense.@ 
Malone, 253 S.W.3d at 257 (quoting Hernandez v. State, 939
S.W.2d 173, 179 (Tex. Crim. App. 1997)).

There is no set amount of nonaccomplice
corroboration evidence that is required for sufficiency purposes; A[e]ach
case must be judged on its own facts.@  Malone, 253 S.W.3d at 257 (quoting Gill,
873 S.W.2d at 48).  Circumstances that
are apparently insignificant may constitute sufficient evidence of
corroboration.  Trevino, 991
S.W.2d at 852.

Additionally, A[p]roof
that the accused was at or near the scene of the crime at or about the time of
its commission, when coupled with other suspicious circumstances, may tend to
connect the accused to the crime so as to furnish sufficient corroboration to
support a conviction.@ 
Malone, 253 S.W.3d at 257 (quoting Brown v. State, 672
S.W.2d 487, 489 (Tex. Crim. App. 1984)). 
But Amere presence alone of a
defendant at the scene of a crime is insufficient to corroborate accomplice
testimony.@ 
Malone, 253 S.W.3d at 257 (quoting Golden v. State, 851
S.W.2d 291, 294 (Tex. Crim. App. 1993)); Meyers v. State, 626 S.W.2d
778, 780 (Tex. Crim. App. 1982).








B.  Non-Accomplice Testimony

Sergeant Jeff Davis of the Denton County Sheriff=s Office
drug enforcement unit testified that a DEA confidential informant,[5]
APaco,@ was
used to set up a reverse buy for one kilogram of cocaine.  Investigator Norrie met with Paco and
equipped him with a recording device. 
Investigator Norrie testified that Paco arranged with Edgar Coronado for
a drug buy on December 17 or 18, 2007, at a Lewisville Wal-Mart.

Sergeant Davis, the lead investigator, gave the
following testimony about the sheriff=s office=s plan:

The way we intended for
it to happen was we were going to have a meeting between whoever showed up, we
knew [at least] Edgar Coronado, and a buyer that we didn=t know[,] . . . were
probably going to show up.

 

We instructed [Paco] to direct them to the 24 Hour Fitness there in
Lewisville, Texas, to have a meeting and to ensure that the money was correct,
the correct count was made.  Once that
happened and [Paco] got the word that the count was correct and that the
required amount of money was present, they were then going to follow [Paco]
over to . . . the Wal-Mart . . . parking lot.

 








They were going to go to a wall . . . on the east side of the parking
lot next to the Sam=s store . . . .  At that location[,] there would be a kilogram
[of cocaine] in the toolbox in the truck parked head in to that wall.

 

It was our hope . . . that the
defendant, or defendants, would pull head in to that wall as well to examine
the kilogram.  Once they examined the
kilogram and they said it looks good, at that point [Paco] was to give a bust
signal and we were going to move in and effect the arrest of whoever showed up.

Sergeant Davis testified that Paco contacted
Edgar on December 17 and the actual purchase was set up to occur on December
18.  He testified that the purchase price
for the kilogram of cocaine was $18,500. 
He testified that he waited at the 24 Hour Fitness in an unmarked Tahoe
and saw Paco arrive in his own vehicle, a maroon Ford extended cab pickup, and
Edgar arrive in a black Chevrolet pickup truck, followed by a white Volkswagen
Jetta driven by Oscar Aguilar-Leiva, with Scott as a passenger.  Edgar and Oscar parked next to each other,
and Oscar and Scott got out of the Jetta and into Edgar=s truckCOscar in
the front passenger=s seat and Scott into the driver=s side
back seat.  He then testified,

I saw a greeting amongst
the people in the vehicle, and then after a very brief period of time, I saw
all of the suspects, Oscar, Edgar, and [Scott], focusing on the center console
area of that pickup truck.  This took
place for I would say five to ten minutes. 
Everybody=s attention in the truck
was focused at this center console of the pickup. 

 








Then Paco pulled out of the 24 Hour Fitness parking lot, followed by
all three of the suspects in Edgar=s pickup
truck.  Sergeant Davis followed them to
the Sam=s
parking lot and watched Edgar=s pickup
truck pull head in to the concrete wall Aas we
planned,@ a
couple of spaces south of the location of the truck with the cocaine, but in
the same row.  Paco had already parked, a
few spaces farther south from Edgar, and Edgar got out of his truck to meet him
at the back of Edgar=s pickup.  They spoke briefly, and then Paco escorted
Edgar to the pickup containing the cocaine. 
Sergeant Davis lost sight of them when they turned in between the
trucks.  Twelve officers were stationed in
the Wal-Mart parking lot.








Scott, Edgar, Oscar, and Paco were arrested.  Edgar was arrested next to the toolbox of the
truck containing the cocaine; the police found his wallet and some pocket
change on him.  Oscar was still in Edgar=s truck
and had $1,001 on him; two cell phones were found in his seat.  Scott was still in the back seat of Edgar=s truck,
and a McDonald=s sack containing $18,460 was
discovered at his feet.  He had $538 and
a cell phone on his person, $115 in his wallet, and an empty blue zipper bag
stuffed into his waistband.  Two
additional cell phones were recovered near his seat.[6]  Sergeant Davis testified that Scott told the
police that he was just along for the ride to get some auto parts and denied
that the cell phones found next to him were his.  He also testified that he believed that Scott
was Athe
money man@ in the reverse buy.  Two McDonald=s
burritos were found on the center console of Oscar=s Jetta.

Patrick LeMaire, of the Denton County Sheriff=s Office
forensics department, testified that he took photos of the information from a
cell phone found in the front passenger seat of Edgar=s
truck.  These photographs were admitted
into evidence and reveal calls made either to or from two individuals:  six calls to or from ACuz,@ at
903-449-7026, between 2:32 p.m. and 6:16 p.m. on December 17; two calls to or
from Edgar between 6:25 p.m. and 6:35 p.m. on December 17; one call to or from
Edgar at 8:12 a.m. on December 18; five calls to or from ACuz@ between
8:42 a.m. and 9:49 a.m. on December 18; and two calls to or from Edgar at 9:52
a.m. and 9:58 a.m. on December 18.  The
phone number of one of the cell phones from the back seat is 903-449-7026 and
has the user name Arickeymarinez@myboostmobile.sprintpcs.com.@

Scott=s sister
testified on his behalf during Scott=s
case-in-chief.  She testified that he is
a thirty-three-year-old barber who lives in Commerce, Texas, and she recognized
his blue money pouch from the photo of Scott taken at the scene.  She testified that Scott used his mother=s car to
drive to Dallas on December 18, 2007, and that the area code for Commerce,
Texas, is 903.








C.  Accomplice Testimony

Oscar testified that he was a codefendant in this
case and had pleaded guilty and agreed to testify against Scott in exchange for
seven years= deferred adjudication community
supervision.  He testified that he lived
in Dallas, that Scott had a barbershop in Commerce, Texas, that he met Scott
last year Athrough a cousin of his,@ and
that he was also friends with Edgar.  He
testified that he has two cell phones and that the cell phone found in the
front passenger seat of Edgar=s truck,
with the calls to or from Edgar and ACuz,@ was
his.  Attributing his lack of memory to a
bad hangover that he apparently suffered on December 18, 2007, he gave the
following testimony about the ACuz@ with
phone number 903-449-7026:

Q. Who is Cuz?

 

A. I had like two
different Cuz, and I don=t recognize the
numbers.  I just go by, you know, what I
have it saved as.

 

Q. Who is Cuz?

 

A. One of them wasCI think one of them was
[Scott].  The other oneClike I said, I have
different Cuz.

 

Q. Is this Robert Scott=s phone number?

 

A. I don=t know about the phone
number.  Like I said, I remember the
nicknames that I have them saved as, you know. . . . 

 








He also stated that he knew more than one Edgar and that he could not
tell whether the calls were incoming or outgoing. 

Oscar testified that on the morning of December
18, 2007, Edgar came to his house and woke him up, and they went to breakfast
at McDonald=s.  He followed Edgar=s truck
in his white Volkswagen Jetta.  Scott
called him and met them at the McDonald=s.  Oscar testified that he took Scott and Oscar=s
McDonald=s
burritos with him in his Jetta and followed Edgar=s truck
to Lewisville.  Once there, they got into
Edgar=s truck,
and Edgar spoke on his cell phone in Spanish to someone.

Oscar testified that Scott became involved in the
drug purchase because Edgar had approached him and asked him for $18,000.  During Oscar=s
testimony, the trial court granted the State permission to treat Oscar as a
hostile witness.  Much of Oscar=s
testimony was given in the following manner:

Q. At this point in time
[at the 24 Hour Fitness], all three of you are aware of what you=re there for; is that
correct?

 

A. I mean, I have an
idea, yeah.

 

Q. And that=s to buy a kilogram of
cocaine; is that correct?

 

A. Well, [Edgar] was
talking to this guy in Spanish, and, you know, he never mentioned anything
about that.  He just said, you know,
follow me so he can go and check this out. 
But, I mean, I believed, you knowCI know he was doing something that, you know . .
. .

 








Q. Oscar, isn=t it true that when you
were asked in your plea bargain agreement testimony under oath you were asked
the question, isn=t it true that when you
all went there, you, [Edgar,] and Scott, everybody there knewCat least all three of you
all knew that you were all there to buy cocaine; is that correct?

 

A. Well, I think I knew
that, and I believe, you know, everybody else knew.  Yes, that=s correct.

 

He also testified that Edgar was the only person who talked about
buying cocaine and knew all of the specifics, that Edgar counted the money and
put it in a McDonald=s bag, and that Scott did not
know the specifics of the transaction. 

Edgar testified that he was a codefendant in the
case, that he had been charged with attempting to possess cocaine, and that he
had not been offered a plea bargain.  He
testified that he met Paco through a mutual friend, that he had known him for
around a week and a half before the drug transaction, and that he had tried to
find a customer for Paco for a kilo of cocaine. 
He testified that he did not buy it because he did not have the money
and because he had Anever messed with drugs.@  He had known Oscar since August 2007, and
Oscar had asked him if he knew anybody who had a kilo of cocaine for someone
who wanted to buy it.








Edgar testified that he had a conversation with
Paco on the morning of December 18, 2007, and then called Oscar and set up the
deal.  He acknowledged that it was his
voice and Paco=s voice on the recording made by
Investigator Norrie on December 17, 2007, and that the nature of their
conversation was for the purchase of a kilo of cocaine.  The trial court admitted the recording and it
was published to the jury.

He testified that he and Oscar went to a nearby
McDonald=s and
met Scott, who had the money and who was supposed to be the buyer.  He testified that Oscar did not have a
hangover that day.

Edgar drove to Lewisville in his dad=s truck,
a Chevy Silverado, and Oscar and Scott followed him in Oscar=s white
Volkswagen Jetta.  When they arrived at
24 Hour Fitness, he called Paco, and Oscar and Scott hopped in Edgar=s truckCOscar in
the front passenger seat and Scott in the back seat.  He testified that although Paco had told them
to count the money, he did not think anyone counted it, or that they started
to, Abut
there was a lot so we just left it.@  Scott had taken the money from a leather bag
and gave it to Edgar; then Scott put it in a McDonald=s bag
and kept it in the back seat, and they drove across the street to a
Wal-Mart.  Edgar stepped out of his
truck; he did not get a good look at the tool box before Aa lot@ of
police arrived and arrested them.








Edgar testified that he was employed selling car
parts and that his father was disabled. 
He testified that this was his first drug deal and that he set it up
because A[w]e
were doing bad at home, and I just wanted to, you know, make a good Christmas
for my family.@ 
He was supposed to receive $1,000 for his efforts.

D.  Analysis

Scott complains that there is no fingerprint
evidence, no DNA evidence, and no videotape or audiotape evidence to link him
to the crimes and that his Amere
presence@ is
insufficient for corroboration.  However,
the following shows more than mere presence at the scene and corroborates Edgar=s and
Oscar=s
testimonies:  (1) as a result of the
phone calls between Paco and Edgar, Sergeant Davis was expecting a buyer other
than Edgar; (2) Edgar drove alone to the 24 Hour Fitness and Oscar and Scott
followed him in another vehicle; (3) Scott and Oscar got into Edgar=s truck
and, for over five minutes, they did something that involved leaning over the
truck=s center
console; (4) the three men followed Paco to the Wal-Mart parking lot and parked
near the truck containing the cocaine; (5) at the time of the bust, Edgar and
Oscar carried less than $1,100 together; (6) Scott had an empty bank money bag
stuck in his waistband, and his area code was A903,A the
same as that listed for ACuz@ on
Oscar=s cell
phone; (7) Scott had $18,460 in a McDonald=s bag at
his feet and an additional $653 on him; and (8) the price for the kilo of
cocaine was $18,500.








Based on our own review of the foregoing
non-accomplice evidence, we conclude that there is Aevidence
that tends to connect the accused with the crime,@ i.e.,
that links Scott in some way to the commission of the crimes, and that Arational
jurors could conclude that this evidence sufficiently tended to connect [Scott]
to the offense[s].@ 
See Malone, 253 S.W.3d at 257.  Therefore, we overrule Scott=s first
issue.

                                      IV.  Extraneous Acts

In his second issue, Scott asserts that the trial
court erred during the punishment phase of trial by admitting testimony of
extraneous acts for which he had not been convicted.

A.  Background








Scott=s
complaint is that, during the punishment phase, Sergeant Danny Powell testified
that while he attempted to execute a search warrant at Scott=s home,
Scott arrived, saw the officers, rapidly backed his car out, and almost hit
Powell, who had to dive into a ditch. 
Another investigator, who witnessed the incident and fired two shots
into Scott=s car=s tires,
corroborated Sergeant Powell=s
testimony.  Pursuant to the search
warrant, the police seized drugs at Scott=s
residence.  The trial court considered
the testimony and Scott=s objections based on Blakely
v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004), outside the jury=s
presence and then overruled them.  The
trial court granted Scott a running objection before the testimony was
presented to the jury.

B.  Analysis

Scott asserts that 

The testimony of extraneous acts of purported
drug possession and attempted killing of an officer were used the [sic] enhance
punishment during the punishment phase of the trial.  These acts were never tried to a jury nor
admitted to by the defendant.  In Blakely,
extraneous acts that had never been tried to a jury nor admitted to by the defendant
were used in the punishment phase; the Supreme Court reversed because the
defendant=s right to a jury trial had been
violated. . . .  Likewise, this court
should reverse the appellant=s
sentence for violation of his sixth amendment right to a jury trial.

However, in Barrow v. State, the court of
criminal appeals set forth the following analysis:

The Supreme Court
determined in Apprendi v. New Jersey that A[o]ther than the fact of
a prior conviction, any fact that increases the penalty for a crime beyond the
prescribed statutory maximum must be submitted to a jury, and proved beyond a
reasonable doubt.@  As Justice Scalia later explained for the
Supreme Court in Blakely v. Washington, the statutory maximum in this
context means the Amaximum sentence a judge
may impose solely on the basis of the facts reflected in the jury verdict or
admitted by the defendant.@  Thus, the
Apprendi line of cases requires that, in any case in which the defendant
has elected to exercise his Sixth Amendment right to a jury trial, any discrete
finding of fact that has the effect of increasing the maximum punishment that
can be assessed must be made by the jury, even if that fact‑finding
occurs as part of the punishment determination.

 








The appellant relies on this determination by Apprendi and its
progeny that a sentence cannot be greater than that authorized by the
jury=s fact‑finding.  But these cases hold that a trial court is
prohibited from unilaterally increasing individual sentences on the
basis of facts that were not resolved by the jury.  Thus, Apprendi and its progeny clearly
deal with the upper‑end extension of individual sentences, when that
extension is contingent upon findings of fact that were never submitted to the
jury.

 

207 S.W.3d 377, 379 (Tex. Crim. App. 2006) (internal citations
omitted).

First, the trial court=s
evidentiary rulings are reviewed under the abuse of discretion standard; that
is, we will uphold the rulings where the evidence is supported by the record
and where the ruling is correct under a theory of law.  Ramos v. State, 245 S.W.3d 410, 417B18 (Tex.
Crim. App. 2008).  Second, we note that
Scott=s reliance
on Blakely is off the mark because the Supreme Court in that case cited
with approval its prior ruling in Apprendi v. New Jersey, 530 U.S. 466,
490, 120 S. Ct. 2348, 2362B63
(2000), and as recounted in Barrow above, A[o]ther
than the fact of [another] conviction, any fact that increases the penalty for
a crime beyond the prescribed statutory maximum must be submitted to a jury,
and proved beyond a reasonable doubt.@  207 S.W.3d at 379.  Third, section 3(a)(1) of article 37.07 of
the code of criminal procedure states,  








Regardless of the plea
and whether the punishment be assessed by the judge or the jury, evidence
may be offered by the state and the defendant as to any matter the court deems
relevant to sentencing, including but not limited to the prior criminal
record of the defendant, whis general reputation, his character, an opinion
regarding his character, the circumstances of the offense for which he is being
tried, and, notwithstanding Rules 404 and 405, Texas Rules of Evidence, any
other evidence of an extraneous crime or bad act that is shown beyond a
reasonable doubt by evidence to have been committed by the defendant or for
which he could be held criminally responsible, regardless of whether he has
previously been charged with or finally convicted of the crime or act.

 

See Tex. Code Crim. Proc. Ann. art. 37.07, ' 3(a)(1)
(Vernon Supp. 2008) (emphasis added).

In the case before us, the jury, and not the
judge, set punishment within the statutory range, the basis of which included
an instruction that the complained-of allegations against Scott had to be
proven beyond a reasonable doubt.  See
id.  Hence, Blakely is
inapplicable to Scott=s second issue, and we cannot
say that the trial court abused its discretion. 
See Ramos, 245 S.W.3d at 417B18.  We overrule Scott=s second
issue.

                                            V.  Hearsay

In his final issue, Scott complains that Paco=s
hearsay statements made during Edgar=s
testimony were admitted in contravention of his right to confront witnesses
under Crawford v. Washington. 













Preservation of error is a systemic requirement
that this court should review on its own motion.  Archie v. State, 221 S.W.3d 695, 698 (Tex.
Crim. App. 2007); Jones v. State, 942 S.W.2d 1, 2 n.1 (Tex. Crim. App.
1997).  To preserve a complaint for our
review, a party must have presented to the trial court a timely request,
objection, or motion that states the specific grounds for the desired ruling if
they are not apparent from the context of the request, objection, or
motion.  Tex. R. App. P. 33.1(a)(1); Mosley
v. State, 983 S.W.2d 249, 265 (Tex. Crim. App. 1998) (op. on reh=g), cert.
denied, 526 U.S. 1070 (1999). 
Further, the trial court must have ruled on the request, objection, or
motion, either expressly or implicitly, or the complaining party must have
objected to the trial court=s
refusal to rule.  Tex. R. App. P.
33.1(a)(2); Mendez v. State, 138 S.W.3d 334, 341 (Tex. Crim. App.
2004).  The complaint made on appeal must
comport with the complaint made in the trial court or the error is
forfeited.  See Tex. R. App. P.
33.1; Heidelberg v. State, 144 S.W.3d 535, 537 (Tex. Crim. App.
2004).  AAn
objection on hearsay does not preserve error on Confrontation Clause grounds.@  Reyna v. State, 168 S.W.3d 173, 179
(Tex. Crim. App. 2005).  Scott objected
only on the basis of hearsay at trial. 
Therefore, he has preserved nothing for our review.[7]  See id.  We overrule Scott=s third
issue.








                                          VI.  Conclusion

Having overruled all of Scott=s
issues, we affirm the trial court=s
judgment.

 

BOB
MCCOY

JUSTICE

 

PANEL: CAYCE, C.J.; MCCOY
and MEIER, JJ. 

 

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED: April 23, 2009











[1]See Tex. R. App. P. 47.4.





[2]541 U.S. 36, 124 S. Ct.
1354 (2004).





[3]In a reverse drug buy, A[law enforcement]
become[s] the seller of the drugs for someone who is looking to buy drugs,
which means [law enforcement] basically play[s] the part of a drug dealer, or a
confidential informant plays the part [of] a drug dealer.@





[4]See Tex. Health & Safety
Code Ann. ' 481.115 (Vernon
2003), ' 481.126 (Vernon
Supp. 2008).





[5]Investigator Shane Norrie
of the Denton County Sheriff=s Office drug enforcement unit defined a
confidential source, or informant, as someone Athat assist[s] law
enforcement in identifying targets of certain investigations. . . . [I]t=s a drug dealer . . .
[used] to make buys for intelligence purposes.@





[6]The police located a
fifth cell phone, belonging to Edgar, in the front center console.





[7]Furthermore, two of Scott=s hearsay objections were
sustained, but he requested no further relief, so these complaints would have
been forfeited even if he had presented his Confrontation Clause argument to
the trial court.  See Cruz v. State,
225 S.W.3d 546, 548 (Tex. Crim. App. 2007) (stating that the only essential
requirement to ensure preservation is a timely, specific request that is refused
by the trial court); Brooks v. State, 642 S.W.2d 791, 798 (Tex. Crim.
App. [Panel Op.] 1982); see also Henderson v. State, 617 S.W.2d 697, 698
(Tex. Crim. App. [Panel Op.] 1981) (stating that appellant=s failure to request any
further relief after his objection was sustained preserves nothing for review);
Parrish v. State, 950 S.W.2d 720, 724 (Tex. App.CFort Worth 1997, no pet.)
(holding that appellant forfeited his hearsay complaint when he failed to
request a mistrial after his objection was sustained and an instruction to
disregard given).

And regarding
Scott=s other two hearsay
objections, he failed to object to the same evidence that came in before or
after his objections were made, so these complaints also would have been
forfeited even if he had presented his Confrontation Clause argument to the
trial court.  See Fuentes v.
State, 991 S.W.2d 267, 273 (Tex. Crim. App.) (stating that a party must
continue to object each time the objectionable evidence is offered), cert.
denied, 528 U.S. 1026 (1999); Leday v. State, 983 S.W.2d 713, 718
(Tex. Crim. App. 1998) (observing that a trial court=s erroneous admission of
evidence will not require reversal when other such evidence was received
without objection, either before or after the complained-of ruling).